Attorney's will argue the case if you would come forward and introduce yourselves please. My name is Peter O'Murphy. I represent the Posen Library Board. Good morning, your honors. Roland Caskey on behalf of the Midlothian Library Board. Thank you. Alright, Antoine. You can start if you'd like. Good morning. I would like to begin by asking for a five minute reserve for rebuttal argument. That's fine. Thank you. Could you fix your mic so that it's coming up? Thank you. May it please the court. My name is Peter O'Murphy. I represent the Library Trustees of the Posen Public Library Board. For brevity's sake, I'll refer to my client as Posen Library and the other party as Midlothian Library. This morning, for purposes of our argument, I'd like to make three specific points. I'd like to argue that Midlothian is a stop from collecting additional monies under certain contracts with the Posen Library. Second, that the party's performance was modified by the underlying contracts, which results in that no additional money should be paid from Posen to Midlothian Library. And finally, that the doctrine of latches bars Midlothian from inserting any claim against Posen at this time. Was the modification argument raised in the trial court? I don't believe it was. I believe that was on appeal for the first time. Okay. So how is it not raised? Judge, I believe that an appellate court has a right to look at this de novo. And the reason is because this was largely decided on cross motions for summary judgment. The case that spawned this particular argument was found during the work on the appeal, not in the trial court. But because we have cross motions for summary judgment, I believe this court can look at it de novo and consider all case law with respect to the arguments of counsel on appeal. Briefly, the facts are this. Beginning in 1987, Midlothian Library provided library services to Posen Library, pursuant to a series of contracts. Small library boards like Posen Library, they don't have the funds to construct library buildings or provide a lot of books or bookmobiles, et cetera. So essentially, what Posen Library does is they're a governmental entity that collects taxes and then funds out or contracts their library services to another larger library. And since 1987, Midlothian Library and Posen Library have been doing that as part of this ongoing relationship. The relevant contracts we're talking about between the parties were dated June 29th of 98, June 19th of 98. I think we're familiar with the facts. Okay. I'll move on then. Specifically then, I assume the reason we're looking at contracts going back to 98 is a statute of limitations issue. In other words, Illinois has a 10-year contractual statute of limitations, so that's why we're looking at 10 years of contracts instead of ones going back to 1987. On June 30th of 2009, the last contract between Posen Library and Midlothian Library expired. In May of 2009, Midlothian Library made the decision to enforce, for the first time, certain provisions of its contractual relationship with Posen Library. As I'm sure the justices are familiar, these provisions would allow Midlothian to add additional fees to Posen Library based on a complicated formula that has to do with the EABD equal assessed valuation. Tell me what you think that formula means, because I've read it 100 times. And, Judge, I'm in the same boat. We've litigated this matter. I, of course, was the trial court attorney as well. My understanding is that, pursuant to this contract, at the time when EABs are decided equal assessed valuation, in other words, all the property values in the village of Posen, it's sent through a complicated formula. And that formula then will be an additional amount. In other words, once we take the, I believe it's about $50,000 that Posen paid Midlothian per year during this contractual period, we take this complicated formula and then we arrive at a number that is, according to the formula, what should have been paid under the contract, less whatever was paid to date, and that extra amount is now what Midlothian is looking for in this lawsuit. Oh, please. How would you state, from Posen's point of view, what the calculation is? I believe it's based, and, again, I'm going to... If I wanted to... Approximately maybe a percentage of the EAV that's then down to how much the library services are a part of that. I think it's roughly 17%, as I recall. If you were going to figure it out, I mean, how would you go about it? The first thing you need to do is get the EAVs for every year, the assessed valuation that comes from the circuit clerk's office, and then you run it through this formula. And this formula, again, is one whereby you would come up with a number. And the specifics of the formula, I'm still unclear about it, because I think during the litigation, at one point, Midlothian argued one number, and then at one point there was another number. They argued one calculation and then another calculation? I believe so. At that position, I believe their library district board president had certain numbers. Afterwards, during some of the argument, particularly the motions for summary judgment and the appellate work, the number was different. And believe me, I think that's one of the major issues of this case, that we don't know those numbers, that they were decided post-contract, during litigation, and that that put the village of Posen at a huge disadvantage. If I may continue with my argument regarding estoppel, elements of estoppel, again, we look at estoppel as where conscience and honest dealing require that a party be estopped from asserting a right or a claim. This right or a claim, of course, is the right to collect additional monies after the expiration. In your brief, in defining equitable estoppel, you cite a case of the promissory estoppel, don't you? I believe so. The case I cited is- Promissory estoppel is not the same. I agree with that. I believe, though, that the Cary v. City of Rockford case is probably the most accurate when it comes to the elements of estoppel, as is Gary Wheaton Bank v. Meyer, and I believe the elements that we have to prove are unambiguous promise from one party to another, reliance on the promise- He's talking about promise. This is a promissory estoppel. Okay. All right. Fair enough. Then we look at what type of estoppel we're dealing with. In this case, I don't believe that- Well, first of all, the reason I believe Midlothian is estopped from charging additional services to Posen Library is because of the conduct between the parties. In other words, during the time of the contractual period, Posen had paid, pursuant to Midlothian's request, all monies that Midlothian said and Posen said- Posen agreed, rather, or at least acknowledged were due under the contract. During the contractual period, Midlothian recontracted with Posen four separate times, and by recontract, I mean Midlothian drafted these contracts, and Midlothian presented them to the village of Posen. The village of Posen then agreed to the contracts. Their library district president signed those contracts, and then the parties, rather, performed under those contracts. But to get to first base, don't you have to have extraordinary circumstances? I don't believe so. I believe the- Isn't that what the case has said? Again, that's where- What case would you say that you don't want to see? In the first instance, I believe we should argue extraordinary circumstances in this situation. But in the second case- To list. Okay. How would you argue? Extraordinary circumstances are- The dealing of the parties is so opposite of what the contractual relationship was. In other words, that during the contractual period, there really was no demand for extra money. None of these calculations were performed by Midlothian, but the services were continually provided. I think we also have to take a step back and say, for maybe the first instance that we've reached the appellate court level, we have two governmental entities performing their primary governmental function that are arguing over whether or not estoppel can apply to a contract. This really is almost unheard of in the appellate court ruling. So I suppose I have to argue from cases that are most similar, and I believe I've done that in my brief. Other circumstances which I believe raise the estoppel issue, that during the period, there were telephone conferences between Posen Library and Midlothian Library. These conferences resulted normally in what the amounts were paid. During some period of time, as the contracts went on. Well, Ms. Sharples, in her deposition, said, I don't remember having any such conversations. That's because we're missing, and I agree with that, that's because we're missing Ms. Peterson, and I'll get to that. That's my last just a second. Specifically then, the contracts were renewed under identical terms. In other words, there was no provision in the follow-on contracts, so to speak, to ask for additional money that were paid under the first contract. But again, that's because the calculations weren't performed until we'd reached the point where the service contract period was over. This is a service contract as well. Do you know who drafted the contracts? I believe it was Midlothian. It would have been back, again, probably in the mid-'80s. From my conversations with Posen Library, nobody in Posen Library had drafted the contracts. They were more or less presented to Posen Library. They cashed Posen's checks, and again, cashing checks, providing services. A service contract, again, not a contract for goods, but a service contract where you cash the checks and you continue to renew contracts, et cetera. I think that's an estoppel argument. Finally, and maybe one of the more important points I'd like to make, is that during this period of time, Posen was continually receiving invoices from Midlothian. Midlothian was billing, and in some circumstances, had sent paid-in-full invoices back to the firm. Well, the only paid-in-full invoice is the one in 2008, right? It's in the record. That's absolutely true. What does that mean? Does it mean it's paid-in-full through 2008? Then maybe that's a measurement of damages. Well, at the time, Posen made the second payment pursuant to that invoice, which was dated August of 2009. Had a dispute arisen between Posen and Midlothian? My understanding is it had not. August of 2009. In August of 2009, I would agree with that. Following the end of the last contract period, that's when it first happened, and I 100% agree with that. Just before, I'd like to go back to staff. Midlothian argues that we shouldn't even consider your argument of equitable estoppel. What's your response? I believe, again, because of the uniqueness of the situation. Well, but what case is it because of the uniqueness? They cite the fact that you should have provided that in your answer or response, and you didn't do it, and you raised it in the motion for summary judgment. I don't think you waive. I think you can plead in the trial court level at any time you want during the trial court prior to the final judgment in the case. I don't believe in any way, shape, or form that you're limited by whatever your answer was. You can raise equitable or any other type of argument any time during the trial court until final judgment. I don't have the case law, but I'm almost certain that that's the nature of the matter. I think that's a red herring, that during any time a court in equity can hear any argument, and certainly the trial judge considered that argument when the trial judge ruled on the motion for summary judgment. Well, this was an action at law for breach of contract. Correct. So you're bringing in equitable. Unfortunately, yes. Well, fortunately or unfortunately, I think we're entitled to equitable relief in this contract. I think estoppel, modification, and latches are all equitable arguments we can make in terms of a contractual obligation. Unless there's any other questions about estoppel, I'd like to move on to the modification I believe took place in this matter. A contract, I cite the case of Nagel v. General Merchandising Corporation, standing for the proposition that if the party's behavior during the contractual period does not conform to the written agreement, that there's a de facto modification of that agreement. In other words, that because of the performance of the parties, the terms of the written agreement were modified. And in this matter, I don't think there's a more clear example of that. The problem I have, Mr. Murphy, is that by not raising this argument in the trial court, you're asking us to reverse on an argument that the trial court was never given the opportunity to consider. That's contrary to appellate practice. I understand that, Madam Justice. However, I view modification as a species of estoppel. Sincerely, I think estoppel and modification kind of go hand in hand. I don't think it's a major surprise on the Milosevian's part that this was raised for the first time on appeal. Do you have a case? I mean, we can't cite Murphy on estoppel. No, no. I understand. I don't have a case. I'll be frank about that. I couldn't find any appellate or Supreme Court case law that said you can't raise certain issues at certain points. If I may continue then, for essentially the same reasons we argued the estoppel, we have a 10-year period. We have, during that 10-year period, Milosevian billing a certain amount of money to the Pozen Library Board. We have Pozen paying these funds as required by Milosevian. We have no demand for additional funds during the contract period. During the service period, there's no request for additional funds. These were paid. Services were provided. During the contract period, nobody came back and said, we need more money. Nobody said, we're going to draft a new contract that's going to require payment of more money. Service provided at the end of the service period. Well, they ultimately did do that. Ultimately, yes, after the expiration of the final contract period in August, as you said. As this contract relationship evolved, they were usually three-year periods. One was for two years. And so at the end of the contract period, whatever it was, Milosevian would then tender a new contract. Correct. So it was within that negotiation framework that Milosevian then tendered a new contract and said, we need you to pay more money. I disagree with that. I believe the facts show that during the period of the contract, the 10 years we're talking about here, that in each and every instance, another contract was sent to Pozen and Pozen signed the contract. I don't believe there was extended negotiation. To understand it, perhaps we should take a look at the nature of the Pozen Library District Board. It's made up of a handful of elected officials who basically meet a few times a year. They, I don't believe, had the benefit of legal counsel. If they did, it doesn't really appear on the record that they did. That the reason they continued to sign the contracts is they wanted to maintain the relationship. Well, one of the reasons that Pozen gave for not raising its levy was that its attorney wouldn't let it. I saw that in the record as well, but there's no evidence that all the following contracts were reviewed by counsel. Personally, I didn't represent the Pozen Library Board until closer to the time of this lawsuit. But at any rate, I do disagree that this was arrived at through some sort of a negotiating process because I think if it was, we would have seen in these contracts some mention of the fact that there was monies due under previous contracts. A period of 10 years, a period of 10 years during which services provided, Midlothian billed, Pozen paid, and the contractual relationship continued. That's the most disturbing thing to me about this case, that during all that time, during all that time, it wasn't until the Pozen Library Board said, no, we're going to another library district board, that Midlothian came back in strong arms and said, no, wait a minute, we want all this money due under the contract. Does that reason have anything to do with how we should decide the case? They finally said, OK, well, you've underpaid it. It's because they said it at the time that you said we're going to go someplace else. This is an equitable argument. And I think in equity, I think it does have a place. But this was an equitable court. Again, we're right. I understand it was a law division. It is. It's a contract case. It is, but I think we have equitable arguments. We have an equitable estoppel argument. But you're not making an equitable estoppel argument. I'll concede that. I think it does go through reformation. At any rate, motives behind contracts? Who knows. But Madam Justice Mason asked me what the circumstances of the contract were. And I'm trying to provide some background as to why the contract was formed in a certain way. And her assertion that perhaps it had been negotiated and we could put the term in there because it knew it would eventually be enforced, I think that's an incorrect assumption because of the factual background of the situation. Finally, I believe we have a laches defense to this case. Laches is a neglect or omission to assert a right taking in conjunction with a lapse of time. And most importantly, certain circumstances that would prejudice an adverse party. Have you cited a case in the context of a breach of contract claim where laches was successful as a defense? No, I did not. The case I cited, I believe, was Highfinger and Myers v. Kistner. In one instance- But isn't the reason in a breach of contract to be a 10-year statute? Yes. So under your argument- Mm-hmm. Should it be- I understand you mean a statute. How can laches apply? That's why you mean- Because of extraordinary circumstances. I think laches- You don't have a case assistant. Again, I think that- We need something- I understand where you're coming from, Mr. Justice. And I think that's why we're a little at sea here. Because this type of issue, where you have two governmental entities that are asserting, in one case, an equitable remedy against another governmental entity, I think that's why we're here. I think that's why- But laches doesn't matter if it's a governmental entity or not. I mean, that's not here or there. I believe laches can apply in less than a 10-year statute of limitations, even in a contractual case. And I believe- But you have no case assistant. I don't see a case that says it specifically does not. The cases I cited do involve those longer periods of time. But I think we can raise that as an issue because of the extraordinary circumstances that we lost not only one library board president, who was, again, instrumental in the majority of the contractual period here, who passed away. And we can't, obviously- But that's not a basis for laches. I think it puts the village of Pozen Library Board into a disadvantageous situation. Because, again, we've talked about the factual relationship between the parties. We've talked about the circumstances behind the contracts in this case. And the other circumstance, of course, is that Susan Corker, who was the president of the Pozen Library Board, suffered a stroke. And that, at that point, was unable to recall very much about what had happened with the- It should be ruled in your favor because of those- Well, then we can't provide a defense. No, that's what laches has. Yeah, laches, because of these two circumstances where we can't provide a defense, then, yeah, they shouldn't be allowed then to proceed against the Pozen District Library Board. At any rate, that's the sum and substance of my laches defense. In conclusion, I would request that this honorable court reverse the trial court's order denying our motion for summary judgment, grant the summary judgment motion that the Pozen Library Board filed, and reverse its rulings with respect to Midlothian Library's summary judgment motion, and reverse the trial court's judgment against the Pozen Library Board in its entirety. I have time if there's any other questions from the panel. Thank you for your time. Good morning, Your Honors. Roland Kesky on behalf of Midlothian. I'll apologize in advance because I swore to myself that I would not chase, so to speak, any of Pozen's arguments, primarily because I do not believe that the defenses that they've raised and that they've talked about here this morning warrant this court's consideration. Your Honor, I have to be there for an injunction. This is all that you said. There was nothing you said. Hold on. Okay. This case is essentially about three... I forgot what I was going to say. Never say never. Hold on. The Illinois District Police Department and their responsibility to follow the current system. This is only a test. And if this actually is true, it should further certify that following the current system. This is only a test. I think we're finished. Is that going to be on the record? This case is essentially about honoring the contract that was entered into between two parties. That's the first issue for consideration. The second issue that's properly before the court is performance. And in this particular case, performance is absolutely undisputed on both sides. It is absolutely undisputed that Midlothian performed. It is undisputed that Pozen did not. Well, I'm going to ask you the same question I asked Mr. Murphy. What does that formula mean? I will explain. I have looked at it, and honestly, since I'm not a mathematician, it took me a bit. But if you break it down simply, there are two options. Under the payment provision, it calls for two installment payments. One installment payment in June. The other in December. The first installment payment is always $25,000. I'm only concerned with the second installment payment. The second one is a simple calculation that the parties are agreed is unambiguous. You take an EAV calculation, which will vary depending on whatever the state does. You multiply that by a fixed amount, which is the general corporate fund levy, during the entirety of this contract. That amount was not 17% or .17%. It was .0017%. And you multiply that by 87 or .87. So, it is either the greater amount, so the way that the provision reads, it is either $40,000 or it is this calculation, whichever is greater. Well, but in one memo that is in the record from Ms. Sharples, takes EAV for the 2001 tax year, multiplies it by .0017, and multiplies that by .87. The amount of the general corporate levy doesn't factor into that calculation. And she now says, right, that I was wrong, that I calculated that wrong. She says that she made a mistake, a mathematical mistake, in her calculation when she submitted the payment to Pozen originally. Right. So, when you say it is undisputed that everybody understood what this formula meant, she certainly didn't understand what it meant. Well, I take some issue with that. I think there is a difference in saying I made a math error versus I don't understand the formula. I think her testimony is that I did understand the formula, even if you understand the formula, even if you understand how to add 2 plus 2. Occasionally, you can make an arithmetic mistake, and I think that is what she did in this case. But what she did in 2002, she does it one way. She says EAV times .0017 times .87 equals X. That is what you owe for the second installment, less $25,000. Then later, she started saying the general corporate levy times .87 percent. That is what you owe us. EAV has nothing to do with it. Then, when we get to the litigation, Midlopian says the EAV in Pozen went up from 2002 through 2008, the last tax year before this contract expired. We want to factor back in all this increase in the EAV so that the second installment from Pozen wasn't $30,000, it should have been $60,000 because the EAV had increased so much. Isn't that now Midlopian's position?  Midlopian's position is that the general corporate fund levy was for this period, .0017. So they're one and the same. There's no two different variations in the formula. The general corporate fund levy in 2002 resulted in an effective tax rate of .0017 of the EAV. As the EAV went up over the years and the general corporate fund levy stayed the same, the effective tax rate went down, right? And that's what Midlopian was upset about. Midlopian said our residents are paying first $0.21 for $100 of assessed valuation, now we're paying $0.42 for $100 of assessed valuation, and your residents are still paying $0.11 for $100 of assessed valuation. That's not fair. I won't deny that's exactly what Ms. Sharples testified to. But she didn't get there until after the contract expired. Well, let me address that. I think that what you're asking or what you're getting at is why is it that Midlopian ultimately went to Pozen to demand this money? And the reason that Midlopian ultimately went to Pozen in 2007 for this underpayment was essentially the entree of Ms. Sharples. She was the new library director and, as such, took a look at everything. Not in 2007. In 2002. She came in in 2002, right? I would have to check the record. She was calculating. She was sending the invoice to me. She knew what was being sent. Not prior to her joining the library. I don't believe she was the library director during the initial few contracts. Is it in the record when she? It is. And what she testified to was that when she became the library director, it was incumbent on her to review the contracts. And when she reviewed them, she realized that there was an underpayment. She sent the memo in 2002. I did differ with you. And that was her first year of dealing with this contract. She sent that memo. I think what the record will show is that in 2007, the summer of 2007, is when she specifically reviewed these four contracts. And at that time, she couldn't give us a specific date. But she unequivocally testified, I'm not sure in her deposition, but it's definitely an agreed statement of fact that she reviewed these in the summer of 2007. So then she went to the opposing board and said, by the way, you owe us more than $30,000. And the opposing board said, we can't pay. We don't have that money. Right. And what they did is they had a period of months' discussion saying, we may raise taxes.  We may pay you what we agreed to under the services contract by raising taxes. Okay. Tell me where in the contract there is a commitment by Pozen to raise its general corporate levy on an ongoing basis to maintain this level of taxation. There's nothing in the contract. The only evidence before the trial court, however, was that these discussions were had. And I believe that Ms. Sharples testified at that position that the way she found out that Pozen was not going to raise its taxes is that she looked at it in the newspaper. And that what they did because, you know, tax rates and those sorts of things are published. They're public. But Ms. Sharples began her employment with the Lothian Library in the middle of the service period in February of 2002. Okay. SSC 91. 2002. Okay. So when she sent out a bill. She sent out a bill. She sent out a bill. She sent out a bill. Well, I stand corrected with regard to her date of employment. But the record is clear that the first time she realized it was the summer of 2007. Right. A little late, isn't it? It's not a little late under the case law. I mean, the question is, it's not an equitable estoppel case. The Houslinger case is directly on point. I think what Mr. Murphy said is you ask him, you know, do you have any law? And admittedly, he does not. In the Houslinger case, that was a case where there were 20 years of delay. And he wasn't charged in the Houslinger case, what was it, a public utility? He wasn't paying anything? Well, it was sewer services. Yeah. I mean, I do not see how Houslinger is meaningfully different than this case. In this case, we're talking about library services that were provided. In Houslinger, we're talking about sewer services that were provided. But we have an ongoing, in Houslinger, he was never charged. And they said a resident couldn't assume that sewer services were going to be provided for free. Here we have an ongoing course of dealing between the parties. And even in 2008, when you say Ms. Sharples recognized that this formula had not been applied correctly and that there had been these underpayments, she then sends a memo, or the invoice, that says payments are based on 87% of Posen Library District's corporate levy. That's all she says. EAV doesn't even enter into it. And then she calculated the additional amount that Posen was required to pay, which brought the payment up to $33,246. So while the contracts were in effect, she takes two different positions on what this formula means. And then once the contract is over, Midlothian then says, it's something else altogether, and you owe us a whole bunch of money. Doesn't Edward Willis-Staple apply there? I don't think it does. In the Houslinger case, I think what you said was that it wasn't a circumstance where the homeowner in that case was ever charged any amounts with regard to sewer services. And factually, I think that's incorrect. I think in the Houslinger case, the homeowner was originally charged certain service fees with regard to the hookup of the sewer system. So they were charged in that particular case some amount for sewer services. Now, unlike this case, there was no ongoing payment in Houslinger for ongoing sewer services. But that's not a case where the homeowner was never charged. I mean, they were in fact charged some amount. But if in Houslinger, the municipality had said to Mr. Houslinger, here's your bill for sewer services, this is how we're calculating it, and did that year after year, I have no problem with saying that would be an equitable Staple case. They just didn't do anything. They had no dealings with them. Right, and that's exactly what we did here. No one was checking what... There were so many bills, and they were paying exactly what you were asking for. Not exactly what they were asking. There was no correspondence during a certain period of time. Midlothian sent the bill. Posen paid it. They did this for 10 years. This is different than the homeowner with the water department. He never got the bill. He never got a bill. Here you have not only an ongoing course of dealing, but you have renewed contracts that Midlothian drafted. Right. And if they recognized when they were drafting these contracts that there was something, oh, there's something missing here, they were drafting the contracts. Posen wasn't objecting to the contracts. Midlothian could have submitted a different contract or proposed a different contract or said, oh, we're changing the contract. Never did that. So Posen keeps getting these bills. They pay them. How is that not different? It is different. But I would say that the fact of, you know, sending bills and correspondences and those sorts of things do not constitute the extraordinary circumstances that would be required to apply a sample. I mean, there is no factually analogous case on every point. Halflinger is the best we have. And it's not very good. And we're really in the new territory here where we have a municipality versus municipality. Well, I don't think that that's a good argument. And I've thought about this one a lot. I have a nine-year-old, to digress a little bit, who's very into presidents. And we were talking about Richard Nixon. And essentially that argument is you should not require extraordinary circumstances because we are Midlothian or because we are Posen. Richard Nixon said, if I did it, it's not illegal because I'm the president. No, but the extraordinary circumstances is a standard that's been developed as a result of dealing with the municipality. It's usually a private individual against the municipality. And they have to show the extraordinary circumstances because we're dealing with municipalities and the money, such as money here, has to be approved by boards and so forth and so on to raise. So that analogy with Richard Nixon, even though you may have a very smart nine-year-old, doesn't work. Well, there may be circumstances where extraordinary circumstances shouldn't be required for municipalities like Posen. But this isn't a good test case. And the reason that this is not a good test case is that if the court applies estoppel without extraordinary circumstances, in this particular case, this kind of function that Midlothian is exercising here is the right to collect an amount it is owed. But there are extraordinary circumstances because what you're asking them to do is to now, in order to pay this money, they have to raise rates astronomically. They don't have the money. And you left them, you know, you said, here's another contract they paid. Here's another contract they paid. Here's another contract. And now when everything's over and they go someplace else, they say, oh, here's how we decided. And so it's extraordinary because of the nature of the entities that we were dealing with. I disagree. There is no case law directly addressing the municipality versus municipality. Correct. But what the case law does say is that in a circumstance where there is a preexisting obligation, for example, in this case, Pozen had a preexisting obligation to pay this amount. The fact that it is now difficult to pay is not an extraordinary circumstance. And the cases don't qualify it in terms of who it is. It's not just difficult to pay when the ability to levy for the budget for the library board is dependent upon the equalized assessed value of property within the taxing district. And a worldwide recession in 2007 and 2008 absolutely decimated the value of real estate within the taxing district. How is that not an extraordinary circumstance? They don't have the ability to levy against value that's gone. Well, the effect of the recession that you raised cuts both ways. In this particular case, the contract amount that we were seeking and the interest on top of that is tied to the Illinois fund rate. And at certain times, the interest being requested by Midlothian under this contract was not even close to 1%. In some cases, it's .021%. I think it could be 0%. But if the equalized assessed value of property within the taxing district isn't there, how does the municipality have the ability to increase its levy to pay what you say it owes? I guess what I would say to your honors is that I do not believe that the ability of the defendant to pay constitutes extraordinary circumstances. To the extent that the court is contemplating a finding of extraordinary circumstances, in this case, it would be carving out new law. And I think it would be carving out new law standing for the proposition that if the defendant is a municipality and is unable to pay, then we should find extraordinary circumstances. The August 2009 statement had the last one that we saw, the one that says paid in full, has three lines under it, 30,000 and 1,000 and 2,000. At some point when those invoices were coming along, somebody realized, oh, 30,000 is not enough, we'll ask for more. And then it says paid in full. So this is 2009. If McGlothian realized by then, oh, there's been underpayments, why wasn't it itemized on one of those invoices? You know, there isn't any evidence. I can't speculate as to what the... Well, it's not on that invoice. Right. That there's an underpayment from previous years. There's clearly an underpayment for that part, that second half of that year of the 2008 bill. Yes. But they clearly had the opportunity at that point to say, oh, and by the way, there was an underpayment for 2003 or 2004 or whatever. They didn't. They didn't choose to do that. So at what point was Pozen supposed to pay this? Prior to filing suit, I don't know that the parties came to any agreement as to when and how. And is that partially because the equation that Ms. Sharples was using changed over time? No. It had to do with Pozen's ability to pay. I think if you look at Ms. Sharples' testimony, she met with them over a period of approximately six months. It could be a little more, plus or minus a month or two. But she was discussing with them, how are you going to pay for what is owed? And I think that she would say, if she were here, that what Midlothian was trying to do was trying to be fair, was trying to give them an opportunity to pay it. And the only way that they could pay it is by raising taxes. Now, there are also the- If they did it in any amount over 5%, the lesser of 5% or the consumer price index, they had to go to a referendum, right? They had to go to a referendum, a vote, to get more than that. I don't disagree with that. And so if Pozen residents, after the fact, after the services have been provided, after the payments have been made, after the contract is gone, and Pozen has gone elsewhere, Pozen says to its residents, and by the way, we'd like you to vote to increase taxes to pay what Midlothian now says we owe. How likely do you think that is going to happen? I don't know that that is an issue that's before the court. I mean, what we're really talking about is Pozen's ability to pay when I really don't think that we should be. And there are all sorts of mitigating circumstances as to why Pozen may or may not be able to pay. For example, Ms. Quirk embezzled vast amounts of money from Pozen. So Pozen's ability to pay was hindered in large part due to the fact that there- I mean, just the fact that she, but I know it's in the record about her taking the money, in her settlement. But what does that have to do with this? Well, I mean, we're talking about- What in the record? Was there anything that- There may be some aspects of it. No, I'm not going to ask. Is there something in the record? You know, I don't recall offhand. I believe I asked her about it at her deposition. I don't have a specific recollection as to the page numbers. But it's a matter of public record. She was convicted. I know. So what does that have to do with this? Well, we're talking about Pozen's ability to pay. But is there anything in the record that shows that her taking that money had anything to do with her ability to pay? That's my question. I don't remember anything. Offhand. Honestly, I don't know. The answer is no. The answer is no. So, you know, it's not in the record. Well, but likewise, there's- I apologize. There's no evidence in the record as to their ability to pay by raising taxes and what effect those would be. Well, but we know what they have to do to raise taxes. And we also know that Pozen was unaware of the misrepresentation, right? They never knew that you were under charging them. There's no evidence that they knew. That's correct. Okay. And they paid what Binlothian said was due. I disagree. They paid whatever Binlothian asked them for, they paid. Is that right? No. No? Why not? Because at some point- At some point. Before you had a dispute, they paid every invoice due. Not in full, no. They did not. What do you mean not in full? Well, they paid the first installment. There's no question about that. They did not make a proper payment. And I don't think the record supports the idea that Binlothian was consistently demanding X amount. But they weren't sending invoices. They weren't sending- Is that what you're saying? Yes. They weren't good about- They could have been better record keepers. But that's their fault. That's simply Pozen's fault. That's right. He tells them he's paying, and nothing comes up. They go into new contracts, and new contracts, and new contracts. And they pay whatever was due. So, all of a sudden, then, you come up with this, well, you owe us more money on a formula which you've already proceeded. There's two or three ways to try to come up with that formula. Well, it's not a question of two or three different formulas. What I was suggesting is that it's option A or option B for the second installment. Where does it say that? In the provision itself, I believe it's 5A of the contract. It says that it's the greater of two amounts, either the formula or $40,000. Right. But you're not asking for $40,000? No. So, we're really talking about the formula. And that's- We're talking about the formula, which you have stated can be considered in various ways. Well, the way that we've calculated it, the way that it's set forth in our brief, I don't think either of the parties ever argued ambiguity. President Quirk said she knew what it meant. Mary Beth Sharples, at her deposition, said she knew what it meant. She interpreted it different ways during the contractual relationship. And then after the contractual relationship is over, it's interpreted a completely different way. Well, I think we've been over the ground. I think that it's an unambiguous provision. The formula, if it's not $40,000, is the EAB times the .7 times the .87. And those are the amounts that we've calculated and set forth. I'm so really troubled by the paid-in-full. The paid-in-full- I mean, by that time, there was already a dispute. So, mid-wealthy and certainly had the opportunity to dredge up all these old numbers and say, here's what you still owe us. There was a dispute. But to the extent that this Court is inclined to say that the paid-in-full check somehow amounts to, you know, a waiver of past sums requested or demanded, that check only amounts to that second installment payment for 2008. It doesn't – it did not relate to – Second installment, 2007. Second installment, 2006. Second installment, 2005. They could have done that. They didn't. Right. Pozen could have also provided correspondence to say this is payment in full for all of the years, but it didn't. But there was no dispute. What's that? There was no – your argument is there was no dispute. No, no. I'm saying – what I'm saying is that even if this Court is inclined to look at this check that says paid-in-full for 2008, it only relates to that second installment payment for 2008 and not all prior years. But I think Justice Kuczynski's point is that's because Midlothian had never advised Pozen, by the way, there's $173,000 that you owe us over and above the amount of this invoice. And so Midlothian knew there was a dispute. Whether Pozen understood, there was a dispute to the extent that Midlothian now says it was owed this amount of money, something over $800,000 according to your calculations. You issued an invoice saying if you pay X amount, it's paid in full. So when the party claiming the additional monies issues their invoice and says pay this amount, paid in full. But it only relates to that second installment payment. I mean, I think – That's your argument. But Pozen – but Midlothian created the invoice. Midlothian could have created an invoice that said additionally pass due for this, pass due for that. They wrote the invoice. They knew that this amount, $107,000, $109,000, whatever it is, was still owing on the back years. If somebody owed me $109,000, I would certainly want to put that on an invoice and say, hey, pay up. And I'm not sure that I would have ever written paid in full on the bottom of the receipt. So how are we to – Right. Well, I think what your honors are inclined to do is give Pozen the benefit of the doubt. And on this particular point, you shouldn't. And here's why. The only evidence in the record is that Pozen also knew that there was a dispute. The only evidence in the record is that Mary Beth Sharples met with them in 07 to talk about all of the prior years where they were owed. So this isn't a circumstance where there's no evidence that they had no idea that they owed the – So your position is that at the time that the paid in full is there, they knew and you knew there was a dispute of all the time period, correct? That's what you just said. They had – There was a dispute. You just said that they knew and you knew there was a dispute for the – For the entire period, correct. Right. And then you provide them an invoice and then you write paid in full. They wrote paid in full. Paid in full. Any questions? I think if you look at the record, the best that they can do – the best that Pozen can do with that is show that paid in full only relates to – While Midlothian certainly could have written, you know, copious letters explaining what their invoice meant, Pozen could have likewise written an explanation along with his check to say this is what we mean by paid in full for the second installment payment. The only evidence is that there was a dispute, that both parties knew about the dispute, and they sent a check for that second installment payment. And so I don't think that there's any – According to Pozen's position in this litigation, it meant we've paid in full. We don't owe you anything else. I don't think the record supports that. And on that point, I would add – The law, and I'm quoting from Standard International Corporations v. Alert Steel, where a balanced claim due by a creditor is fairly in dispute, Jesus said, controversy renders the claim unliquidated. Where a claim is unliquidated or disputed, the acceptance and use of the remittance tender in full of the claim amounts to an accorded satisfaction of the entire obligation. Well, I would say this. The issue of estoppel, the issue of accorded satisfaction, the issues of laches, aren't even properly before the court. Why is that? That's because the Code of Civil Procedure requires you to plead them affirmatively and not in a motion for summary judgment. You cited a case in support of that proposition on a motion to dismiss, correct? Correct. This is not a motion to dismiss, is it? And if you look at the law with regard to motion for summary judgment, you can frame it. But you cited a motion to dismiss. That's correct. But the Illinois Code of Civil Procedure specifically requires that you plead them. And as the case law says, in connection with a motion for summary judgment, you need not plead them. You can bring it up. That's the law. In a motion to dismiss, it's a different situation. But now you're dealing with a pleading. We're not dealing with pleadings. Right. It's a motion for summary judgment. So all I'm saying is that it doesn't mean you lost. It just means that the law says that the court can't consider the affirmative offenses. Well, I wish I could argue that the law was different, but I can't. But what I can tell you is that essentially what this case is about is performance under the contract. I think Pozen and Midlothian agreed that the only evidence, regardless of the findings of this court, is that the calculation is what it is. They both testified they understood it. And it's absolutely undisputed in this case that Midlothian performed and Pozen did not. At the trial court level, they never disputed any of the calculations. I mean, I think what one of the issues that this court is wrestling with is that why during the negotiation between the parties wasn't there more about how much you owe us, when you owe us? Well, even at the trial court level, there wasn't any issue as to the amounts we calculated. I mean, I challenge Mr. Murphy to show exactly where in the trial court proceedings that he specifically challenged the calculations. He didn't. So if the court is troubled by the fact that non-attorney party litigants didn't have more dialogue about the calculation, well, it's certainly troubling that after being represented, they didn't contest it. They certainly had the opportunity then. Well, all the years that they were paying this money, there was no dispute about the calculations. They were just assuming that Midlothian, who was going to benefit from this calculation, was calculating it the right way and was telling them how much they owed, and they paid what Midlothian said to pay. So all through all of this whole contracting period, there was no dispute about the equation, let's call it, because Midlothian was telling Pozen, this is how much you owe. Pozen wasn't recalculating the equation. They were just taking Midlothian's word for it, assuming, I think like most people in a contract, that if somebody owes you money, you're going to tell them how much money they owe you. You're going to figure it out the right way. So they paid what you told them. Pozen paid what Midlothian told them every year from the beginning of this contract sequence. And then you say paid in full on a statement that was prepared in Midlothian, and it's true, it says 2008, but it could have said anything. It could have said, because you were the ones who were preparing it. You could have typed anything into it. True. So I'm having a hard time with this. You're talking about performance on the contract. Pozen says they performed on the contract because they paid what you said they owed you, and you were doing the calculation, and one would assume that you were calculating it for your benefit. Actually, that's not what they're saying. In the trial court, what they said is they didn't say anything as to the calculations. We had discussions with them as to the amounts owed. And admittedly, there are mistakes. We made miscalculations. And then when we realized the miscalculations, we went back to them and said, hey, we made a mistake. This is not the right amount. What Pozen argued in the trial court is not that we didn't pay the right amount. I mean, look in the record. They've never argued that. What they've argued is that we shouldn't be forced to pay what the contract says because. Pozen would have been able to pay what Midlothian now says is the right amount had it increased its general corporate levy over the years. And it didn't increase its levy over almost any of the years of these contracts. And the relief Midlothian wants now is a judgment that approximates what would have happened had Pozen increased its general corporate levy. That's troubling to me because it then requires us to go back and rewrite history and force a municipality to raise tax revenue that isn't there. I don't think it requires the court to rewrite history. I think what it requires is that the court enforce a contractual provision that Pozen freely agreed to. And that the ability to pay is not necessarily the issue. The issue is whether they agreed to it. And they did agree to it. There are issues of performance. We did perform. And they've never argued that they didn't perform. What they're arguing is that they should get out of it because now they can't pay. And what we should have done. It's asking us to assume things. Let me ask you hypothetically. Let's assume that in 2006 when real estate values were at their peak, Pozen said let's put out a referendum to see if we can raise our general corporate levy and we'll end up paying Midlothian more. And the voters voted down. They say no. Midlothian still gets to enforce the contract as written? Yes. I mean Pozen still owes the obligation. I'm not sure I understand Midlothian's interpretation of the contract is that Pozen could commit to pay funds it never had. If the voters voted down the referendum and said we're not increasing the general corporate levy, meaning the library district's levy is not going to increase, Pozen committed itself to pay that regardless of the revenue. I like your hypothetical and here's why. Because Pozen's ability to pay does not necessarily depend on whether it can raise taxes. Is it a factor? It sure is. The formula is all tied to EAD. So if the EAD is the component but the revenue isn't there. Here's my point. Pozen has the ability to decide what it spends its money on. In this case it decided that it wanted to pay for library services. Does it have to pay for library services? No, it does not. But if it contracts to do so, then it should have to pay for the services that were, in fact, provided. Do they have to raise taxes necessarily? No. They can choose that they don't want to have. We can say to Pozen residents we're not picking up garbage, we'll pick it up once a month and the money we save we'll give to Midlothian for the library services. Right. That's within Pozen's control. That's why I don't think that the discussion of their ability to pay now factors in. In order for us to make a decision based on that, the court is going to have to assume what Pozen could and couldn't do. Okay. But the whole time that you were underbilling Pozen, all those years you were underbilling Pozen and you were coming up with the calculations, if you'd come up with the right calculations, their committee could have made the same decisions. Your miscalculations have now led to this gigantic leap. I disagree with that and here's why. Because you're making the assumption that had we, over this period of time, allowed them to take smaller bites at the apple, so to speak, it would have been palatable and they would have been able to do it. If you had billed them for the right amount, they are going to be able to do it. Your finance committee would have made appropriate financial and budget decisions. But you weren't. So they're thinking, we've paid Midlothian what we owe them, great. Now we know how to spend our budget money. Right. But even when they knew, the only evidence in the record at this point is even when they knew they had underpaid and there were negotiations as to how can Pozen pay for that, they still chose not to do anything. They still chose to pick up garbage once a week and turn the trees in the village instead of coming up with saying that Midlothian, 30 more thousand dollars. Right. They knew that they underpaid. So what, I mean, if they have affirmative defenses, this doesn't make sense. I think what the Justice's point is, and I don't propose to speak for any of you, but the argument being posed or the question being posed to me is, had you billed them appropriately, had you done these things, had you notified them of the dispute, they could have raised taxes in a way that they paid for it. And the only evidence is that we did tell them about the dispute, albeit later, and then they chose not to do anything about it. They chose not to seek more money to pay for it. Why should they? Again, everything was in your hands. And we're way past the dates. I mean, the first contract, they go into a second contract, they go into a third contract, they go into a fourth contract under the dispute. I disagree that everything was in our hands. What was not in your hands? Tell me. You said not everything was in your hands. What was not in your hands? In order for equitable doctrines to apply, for example, this disposal, we have to be intentionally giving up our rights, known rights. And I think the only evidence is that we, regardless of the paperwork that is... You go into the first contract, you go into the second contract, you go into the third, you send them bills, they pay the bills, everything's going on. Then you negotiate, and all of a sudden, they go someplace else, and you say, all right, we'll put our foot down, we're filing a lawsuit. After you send them a, you know, they paid a bill, paid in full, there's a dispute, what the amounts are. I think we filed a lawsuit only after they flatly refused to pay any amount. And the dispute did not arise because we were negotiating a new contract. They decided to seek library services elsewhere to stick it in our eyes, so to speak. I think the record supports that. Well, the record supports the fact that the two library boards were at each other's throats, and they went elsewhere. Right. And in the record, there is a comment that this was payback. I'm not saying that was the only reason, but there is that in the record. To tie up the estoppel argument, I don't think it's properly before the court. I don't think that this is an appropriate circumstance for this court to carve new law, to find something extraordinary about this, because that would lead to a slippery slope in terms of every time a municipality seeks to enforce its contracts, seeks to collect revenue that it's owed for services provided. And I think that the extraordinary circumstance, as I hear it, hinges in large part on their ability to pay, which it should not. The sole issue on cross-appeal was the proper date for the calculation of prejudgment interest on the contract amount. Judge Powell, I would applaud her. She spent a great amount of time. I think we had three or four hearings on the prove-up of damages. And on that score, essentially what she did, and there's a dispute as to the basis for her decision, but she determined that in August of 07. So why should we even, I mean, the problem is there's a dispute with what she did. We don't have the record. There is no record on this issue. So why should we even consider it? Well, in the agreed statement of facts, it's clear that she ruled that interest should begin to accrue on the contract. Right. In August of 07. But you disagree. No, no. We don't disagree that that was her ruling. We disagree for the basis for her ruling. Right, right. And we don't know what that basis is. Well, there are two possibilities. But we don't have, the point Justice Hyman is making is you didn't provide us with a record where we could look in the record and say, no, this is the proper basis. There is no transcript of that proceeding. If I had to give it to you, I would have. We could find any reason then to uphold her. Because we don't have it. You two disagree. Well, there are only two positions. It doesn't matter. We don't know what the position is. It doesn't matter. It doesn't matter. We don't know what her position is. You say it's your position, but she did make some statement. Right. We don't have it. Why should we consider it? Because, quite frankly, if this court reviews what the trial court did, it's that interest began to accrue in August of 07. The reason is unnecessary. Pozen contends that that was based on the date that Midlothian discovered the underpayment. Well, Mary Beth Sharples testified that she discovered the underpayment in or about June of 2007. She also testified in the summer of 2007. So even if you construe all of the facts against us using Pozen's best case scenario for the basis of her decision, it would have been earlier. Ours is, quite frankly, the more conservative estimate as to why she would have ruled that way, the date of demand forward. So I guess I don't know that it makes a whole lot of difference. It makes a difference in money. Two months, I would say, in the scope of this case is relatively insignificant. I mean, Midlothian's been waiting for its money for almost 15 years. But in your cross appeal, you want prejudgment interest calculated from the date of the underpayment, right back to 2001. That's right. Right. We do, because that's what the contract provides. Section 5B is clear. It says interest is calculated in this amount. And regardless of their ability to pay, it is a very low interest rate over the course of the contract. It's tied to the L&A fund rates, and at certain points, that's .021%. We believe that the contract should be enforced as written and that Midlothian is entitled to prejudgment interest as set forth in the contract. Accordingly, Midlothian requests that this court submit this matter back to the trial court with instructions for a judgment in an approximate amount of $850,000 plus interest. Thank you. Thank you. Mr. Murphy? Thank you. I'll be brief. I take umbrage with counsel's characterization of Pozen's objections to damages at the trial court level. We actually had to have a proof-up on damages, a special hearing, because Pozen objected to the damages calculation, to the proof of damages, and to any other background that they have. But again, they have no transcripts. I understand that, and that, I think, is more fatal to Midlothian's case than it is to Pozen's case. But counsel said he just accepted everything. No, we didn't. Yeah, that's an incorrect statement, yes, because the motion for summary judgment objected to the damages and the calculation, and we've raised that on appeal as well. And during this hearing, in fact, I think if you recall, there were two separate bystander statements filed in this case because we could not agree that that had been objected to. But I think at this point it's disingenuous to say, well, Pozen went along with our damages all along when not only did we object on our motion for summary judgment, we also requested and, in effect, had a proof of damages. Again, I don't think it's the burden of the plaintiff to prove damages more likely than that, and I don't think they met that burden. Second, I think a lot of our argument today, particularly after questioning from the court, involved the Heiflinger case. Briefly, and without being too redundant, Heiflinger was a resident of a municipality of Wooddale. Wooddale neglected to collect services for sewage for a period of 20 years and then sought to lien Heiflinger's property. The court decided in favor of Wooddale because they said that the city wasn't aware. And I think the public policy reason in the Heiflinger case is that municipalities don't always have the same people in charge. Over 20 years, there's going to be elections. There's going to be different trustees. There's going to be different mayors. All those things then let a court say in the Heiflinger case, hey, wait a minute, if it's a municipality, we're not going to hold them to a standard of due diligence when it comes to collecting them. But as the justices have pointed out during argument, this is a government entity versus a governmental entity. What then did Heiflinger say were the elements of equitable estoppel against any municipality? Affirmative action on the part of the municipality. In this case, what's the affirmative action? Midlothian provided library services, billed for those services, and sent even a paid-in full invoice to Pozen for library services. Second, inducement of the complaint of action. They want the contracts. They've induced Pozen to participate in those contracts by offering these services, et cetera. Three, a substantial change in position in justifiable reliance. As the justices have pointed out, there was a substantial change. What could we have done in the village of Pozen back when the contracts were first engaged? What if the amounts were more? What could Pozen have done? They could have raised the levy. They could have raised it without going to referendum if it was a small enough amount. Less than 4.99 percent, I believe, is the statutory authority for raising the levy. Second, continuing the contract and requesting these services is another change in circumstance. They could have also found another library board that would be willing to provide these services, perhaps at a discounted rate than Midlothian ultimately charged, or is seeking to charge rather here under the auspices of this lawsuit. Midlothian's remedy in this case, if they felt they were not charging, counsel admits they don't know that they weren't undercharging until very late in the contractual relationship, but they could have discontinued services. That's a normal contractual remedy. To say we're not going to go back and continually not charge you for these services is not going to have you use our services anymore. Go find somebody else. They didn't do that for a period of 10 years. As Justice Hyman said, POSEN is a government philanthropy. They can only raise revenues rather through their taxing authority. A substantial judgment in here would force POSEN to somehow raise library taxes on their residents, perhaps even exceeding their statutory authority because they'd have to go to referendum, and that's beyond the control of the library board. POSEN Library was elected to make these financial decisions. Giving Midlothian this judgment would, of course, take away that role, which is not only elected, but it's a state-mandated role. Finally, with respect to when POSEN knew that they were underpaid, I'm sorry, Midlothian knew and POSEN knew that there was an underpayment going on, again, I would emphasize that was very, very late in the contractual period when really the ship more or less had sailed. But the contractual obligation was over, that the payments had all been made, et cetera. Are you saying that they paid them for it at that time? Were you aware of this? And he said yes. I know he did. You know what, the record, it doesn't have a whole lot with that. During the trial process, there were requests to produce records. What you have before you is everything that we found from Midlothian with respect to their decision-making process and any notification between Midlothian and POSEN. I think that's important. Again, the latches defense relied on the fact that there were... For purposes of accord and satisfaction, Midlothian, prior to filing suit, they may have taken the position that this formula means you should have been paying us more money. Did they ever tell POSEN, Ann, we're going to sue you for it? The record does show a demand letter. Counsel is correct in that. It was shortly before suit was filed. It was after the contract period that there was that. Was it before or after the paid-in full? I believe it was after the paid-in full. I believe that, and the record, I think, will certainly speak for itself when it comes to that. With that, I thank the justices for their attention today. And renew our request for our lenders in the field. Thank you, Edwin, for your lively oral argument and excellent brief. May I approach the court with just one brief comment as to the profit field? Sure, go ahead. I think the majority of our discussion about ESOPL focused on the extraordinary circumstances when, in listening to counsel, it occurs to me that in order to get to extraordinary circumstances, they have to first prove the elements of ESOPL that would be required for any litigant. And in this case, they really didn't. I think one of the things that we talked about, and one of the elements of ESOPL, is they are required to prove a change in position. But the only evidence in this case is that even after they knew that there was a dispute, they didn't change their position. They didn't raise their taxes. They didn't do anything. How is this related to cross-appeal? And ESOPL. This relates just to the point of ESOPL. Not the cross-appeal. I think you misled us on your coming back, because you could have made these comments before. When somebody comes up and says, I have something on the cross-appeal, which is your appeal, and then you start arguing again what we've already heard. I apologize. The issue on the cross-appeal was with regard to some of the statements that counsel made. I certainly did not intend to offend him. We've already talked about cross-appeal. Well, what he did say is that Pozen did object. And the tension is that there is no record on it. Okay. But there is something in talking about this stuff. I agree, Your Honor. I apologize for raising ESOPL again. But as to the cross-appeal, there is a record of what they did and didn't object to. As set forth in our briefs, and we specifically point this out, that we submitted three affidavits and dozens of documents. On the cross-appeal, was there a hearing? There were three or four hearings. On damages? Yes. Okay. Then there was a disagreement on damages. Apparently, if there wasn't a disagreement, there would not have been a hearing. You would not have had to put all the evidence in. You said that they agreed, they didn't object, all this other stuff. Apparently, that wasn't the case because otherwise you would not have had that hearing. I think that the briefs themselves belie that argument because in the lower court, we specifically set forth what they did and did not object to. And in the lower court, they specifically did not object to our calculation of damages. They did not object to our calculation for the missing or unreturned books. They did not object to the summary of underpayments. And they didn't object to the authenticity of any of the contracts. What they did object to was the EAB, the Illinois Fund Rate, and our spreadsheet. So when we're talking about whether they objected in the lower court, there is a record of what they did and didn't object to. And I would invite the court to look at that. Thank you.